**Opinion issued November 21, 2022.**



In The

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-22-00404-CV**

————————————

**IN THE INTEREST OF E.S.T. AKA E.T., A CHILD**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-01176J**

---

**MEMORANDUM OPINION**

This appeal involves a parental termination case. The trial court entered a final decree terminating S.C.S.'s ("Mother") parental rights to her minor child, E.S.T. ("Elliott"), based on the court's findings that Mother (1) knowingly placed or knowingly allowed Elliott to remain in conditions or surroundings which endangered his physical or emotional well-being, (2) engaged in conduct or knowingly placed

Elliott with persons who engaged in conduct which endangered his physical or emotional well-being, (3) constructively abandoned Elliott, and (4) failed to comply with the provisions of a court order. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), & (O). Mother argues that the decree terminating her parental rights is not final, and that even if it were, there is legally and factually insufficient evidence supporting the trial court's findings that (1) she engaged in one or more predicate acts requiring termination of her parental rights under Sections 161.001(b)(1)(D), (E), (N), & (O) of the Texas Family Code, and (2) termination of her parental rights was in Elliott's best interest. Mother further contends the trial court abused its discretion by appointing V.S. ("Valerie") as Elliott's conservator.

We affirm the decree of termination.

## Background

On January 22, 2018, the Texas Department of Family and Protective Services ("Department") received a referral concerning Mother's neglectful supervision of Elliott.[1] According to the referral, Mother had removed two-year old Elliott from D.J.L.'s ("Father") care at gunpoint. The Department, which had received other referrals of Mother's neglectful supervision of Elliott while the Department's case

---

[1] For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

To protect the identity of the minor child, we use Elliott as a pseudonym for him and Father and Mother to refer to his biological parents. *See* TEX. R. APP. P. 9.8.

was pending, learned in 2019 that Mother was facing federal charges for multiple counts of robbery. On March 14, 2019, the Department filed a petition seeking managing conservatorship over Elliott and termination of Mother's and Father's parental rights. Trial commenced on September 10, 2020.[2]

## A. Trial Testimony on September 10, 2020

### 1. Kirbi Clark

Elliott's caseworker, Kirbi Clark ("Clark"), testified the Department became involved with the family after it received a referral in January 2018 alleging that Mother had removed Elliott from Father's care at gunpoint.[3] The record reflects that Mother was charged with aggravated assault with a deadly weapon. According to Clark, the criminal charge against Mother was dismissed because Father did not appear for court.

The Department received another referral in January 2019 alleging a police officer had seen Elliott alone in a car parked in a hotel parking lot while Mother was at work inside. The officer reported that he stayed by the car for approximately two

---

[2] Although the Department's petition for termination of Father's parental rights was also at issue in trial, Father is not a party to this appeal and, thus, we are limiting our discussion to the facts pertaining to Mother, as appropriate.

[3] According to Clark, there were several referrals associated with this incident.

hours waiting to locate the mother. Elliott, who was born in February 2016, was two years old when this incident occurred.[4]

Clark testified that, in addition to the aggravated assault with a deadly weapon charge stemming from the January 2018 incident, Mother was also on deferred adjudication community supervision for the state jail felony offense of abandoning a child with intent to return when the case began. The child abandonment charge stemmed from a 2015 incident when Mother left her two oldest children, who were eight years old and three years old at the time, alone at home while she was at work. The 2015 incident also resulted in a referral to the Department for neglectful supervision. Clark testified that the State had filed a motion to adjudicate guilt with respect to this charge and Mother's next court date was in October 2020.

Clark testified that Mother had also been indicted by a federal grand jury for robbery, she was arrested in July 2019 for those charges, and was in a federal detention center at the time of her trial. Clark did not know when Mother's next court date for the federal charges was set.

In addition to the referrals to the Department and Mother's alleged criminal conduct, the record reflects Mother tested positive for illegal drugs twice while the

---

[4]    Clark testified that the Department also received a referral in September 2018 alleging that Mother had left Elliott alone. The record, however, reflects that the September 2018 referral involved allegations that Mother was chasing someone while she had three children in her car, including one child hanging out of the car window.

present case was pending. Mother's hair sample tested positive for cocaine in February 2018 shortly after the case began. When asked if a parent's use of cocaine while caring for a very young child is considered endangering conduct, Clark testified, "Yes, that is very concerning, in our opinion." The record reflects that Mother also tested positive for cocaine and marijuana in May 2018.

Clark testified the Department developed a family service plan for Mother and Mother had been participating in services until she was arrested for federal charges in July 2019. According to Clark, Mother submitted to drug testing, submitted to a psychological evaluation, and followed the evaluator's recommendations. Mother also completed parenting classes and provided a certificate of completion. Mother, however, did not complete a substance abuse assessment and she did not follow all recommendations or demonstrate she was able to provide stable housing and stable employment.[5] Mother informed Clark that she was not able to complete her remaining services while in federal custody. Clark explained that Mother's hair sample tested positive for cocaine when the present case began in February 2018, but that her subsequent drug tests were negative.[6] The Department was nevertheless

---

[5] When asked if Mother had refused to work her services in August 2018, Clark testified she did not know because she was not the caseworker at that time. The Child Advocate report reflects Mother refused to complete her services in August 2018.

[6] Contrary to Clark's assertion, the record reflects Mother also tested positive for cocaine and marijuana in May 2018.

concerned that Mother had not completed her substance abuse evaluation because "she never received any treatment, and so, we would hate for her to regress and begin using illegal substances again."

Clark testified that, to her knowledge, Mother had not written any letters to Elliott or sent him anything since July 2019, when Mother's confinement in the Federal Detention Center began. Although Clark received clothes and shoes from Elliott's maternal grandmother and D.C. ("David"), Mother's boyfriend and the father of her youngest child ("Debra"), Clark did not know if the gifts were sent at Mother's direction.[7]

With respect to Elliott's placement, Clark testified that Mother's two oldest children were living with their paternal grandmother, who has conservatorship of the children as a result of the 2015 referral of negligent supervision by Mother. The paternal grandmother is not related to Elliott. According to Clark, the Department approached the grandmother about possibly placing Elliott with her, but she was struggling financially and could not afford to care for another child. Mother's youngest child, Debra, was placed with Debra's father, David.

Clark testified the Department had completed home studies for Elliott's paternal uncle Ivy Davis ("Davis"), Father's cousin April Spicer ("Spicer"), and

---

[7] To protect her identity, we use Debra as a pseudonym for her. *See* TEX. R. APP. P. 9.8.

6

David. Although Elliott was initially placed with Davis, Elliott was removed shortly after. The Department was concerned that Elliott was actually staying with another paternal relative and it had concerns about the safety of the situation.

Clark testified that Father submitted his cousin, Spicer, as a possible placement for Elliott. She testified the Department considered Spicer after Elliott was removed from Davis' home. According to Clark, Spicer, whose home study and risk assessment had been approved, had been visiting with Elliott since March 2020 and those visits had been "very appropriate." Clark testified that Spicer appeared to get along well with Elliott and he had bonded with her. Spicer indicated to Clark that she wanted to keep Elliott long term and Spicer never indicated she would be unable to do so. Clark also testified that Father was present for one of Spicer's visits with Elliott and Father behaved appropriately during the visit. She did not have any concerns about Spicer's protective ability. She further testified she did not have any concerns with respect to Father's ability to "be appropriate and respectful" if Elliott were placed with Spicer, and Clark had "not received any indication that there would be concern for the child's safety."

David, who was present for trial, is Mother's boyfriend and he has custody of their infant daughter, Debra. Clark testified that David's home study was approved, and he was willing to be a permanent placement for Elliott, "up to and including

7

adoption." According to Clark, Elliott had visited with Debra and David three times and David interacts well with Elliott.

On cross-examination, Clark testified that the Department knew David was still in a relationship with Mother. The Department was concerned David might not be willing to keep Elliott long-term if Mother was not released from jail. The Department was also concerned that David and Mother would continue their relationship if Mother was released from jail and they questioned whether David would "still be willing to be protective of [Elliott] and ensure his safety" under those circumstances. According to Clark, the Department talked to David about these concerns. David informed the Department he was willing to be protective of Elliott irrespective of Mother's release from jail and that he was willing to follow the guidelines the Department and the court ordered. When asked if the Department was concerned that Elliott "could potentially be back in an environment where his mother is around him and has access to him, given her extensive criminal history," Clark acknowledged that was a concern. When asked if she felt it was appropriate for Mother to have this type of contact with Elliott after her release from prison, Clark testified that Elliott is "very well bonded with his mother, and that as long as Mr. David is willing to be protective and keep [Elliott] safe, that's our major concern."

Clark testified that the Department was requesting termination of Mother's parental rights to Elliott, and she believed that termination of Mother's rights was in Elliott's best interest because Mother had been "unable to provide a safe and loving and nurturing home." She also believed that it was in Elliott's best interest that he be placed with David. The Department asked to be appointed Elliott's permanent managing conservator "to continue to work for permanency" for Elliott. Clark further testified that Elliot has "been in limbo and he deserves a safe and nurturing home."

### 2. Mother's Testimony

Mother testified that she has four children, thirteen-year-old "Evan," seven-year-old "Erik," four-year old Elliott, and eight-month-old Debra.[8] Evan and Erik live with their paternal grandmother who has conservatorship of the boys, and Debra lives with her father, David.

When asked about her criminal history, Mother testified that she was charged with the Class A misdemeanor of unlawfully carrying a weapon in 2006 after the police found a handgun in her car. Mother explained that she was not aware that the

---

[8] We are using pseudonyms for all the children to protect their identities. During her trial in September 2020, Mother testified that Debra was eight months old. The record, however, reflects the Department received a referral concerning Debra in February 2018—over two and a half years before trial. Thus, the record suggests that Debra was older than eight months old when Mother testified in September 2020.

gun was there. She pleaded guilty and was sentenced to ten days in jail. Mother was also charged with endangering a child in June 2010 after Evan was left at home alone with access to a firearm. Evan was two years old at the time. Mother explained that her sister was babysitting for her when she was at work, and her sister left the kids at home by themselves. Mother also denied that the firearm was in a place where Evan could have accessed it. She pleaded guilty and was initially placed on deferred adjudication for that offense. Her deferred adjudication was later revoked, and she was sentenced to six months in state jail.

Mother was also charged with the Class B misdemeanor offense of theft in 2012 for theft of jewelry. Mother testified that her friend had stolen the jewelry, not her, but that the police had arrested Mother because she was with her friend at the time. Mother testified that despite being innocent, she nevertheless pleaded guilty to the theft offense because it was cheaper to plead guilty than to hire an attorney to fight the charge. She was sentenced to two days in jail for the offense.

Mother also pleaded guilty to the Class A misdemeanor offense of failing to identify herself to a peace officer in September 2014. Mother denied failing to identify herself to the officer, and suggested she was charged because she did not have her driver's license with her when she was stopped. She was sentenced to fifteen days in jail for the offense.

Mother was also charged with the state jail felony offense of abandoning a child with the intent to return in 2015, when she left her two oldest children, eight-year-old Evan and three-year-old Erik, alone at home while she was at work. Mother explained she only left the children at home alone because she did not have childcare. She was placed on deferred adjudication with a period of community supervision for four years. The State filed a motion to adjudicate guilt with respect to that charge in May 2018, after she was charged with aggravated assault with a deadly weapon stemming from the January 2018 incident involving Elliott and Father.[9] The motion to adjudicate was pending as of the time of trial.

Mother was in federal custody for robbery at the time of trial. According to the federal indictment, which was admitted into evidence, Mother was charged with three counts of robbery and three counts of knowingly carrying, using, and brandishing "a firearm, namely, a handgun, during and in relationship to a crime of violence." On November 13, 2018, Mother allegedly robbed a hotel employee "by means of actual and threatened force, violence, and fear of injury" while knowingly carrying, using, and brandishing a handgun. On November 17, 2018 and January 6, 2019, Mother also allegedly robbed other hotel employees in the same manner.

---

[9]   Although the testimony reflects that Mother was charged with burglary, the exhibit states Mother was charged with aggravated assault with a deadly weapon. The assault charge was later dismissed because Father allegedly refused to cooperate with the State. Father denied that he failed to cooperate.

Mother was arrested for those charges on July 15, 2019. Mother testified that her next court date for her pending federal charges was set for October 10, 2020, and she had not been offered a plea deal. She also did not know the range of punishment for those charges should she be convicted.

In addition to her criminal history, Mother acknowledged that she also has a "pretty extensive CPS history." The circumstances leading to Mother's 2015 child abandonment offense involving her children Evan and Erik also resulted in a referral to the Department. When asked if the 2015 referral included allegations that her sons were found wandering in the parking lot, Mother testified, "Not to my knowledge." She acknowledged that her mother had conservatorship over both boys because of the referral.[10]

When asked about the January 2018 allegations that she and her brother had gone to Father's home and retrieved Elliott at gunpoint, Mother testified that the case had been dismissed because neither she nor her brother had a gun. Mother claimed that Father recanted his prior statement to police that she had a gun and claimed Father did not attend any court proceedings because he knew the allegations against her were untrue. Mother claimed that although Father was fine with her removing Elliott from his home, he was angry that she brought her brother with her and he

---

[10]     The record reflects the Department received a referral concerning Debra in February 2018. Mother is listed as the alleged perpetrator and allegations, which are not included in the record, were ruled out.

called the police in retaliation. Mother acknowledged the Department tried to work with her and offered her family-based services while Elliott was placed with a friend in May 2018, and she denied ever refusing to do her services.

Mother also admitted the Department received a referral in September 2018 alleging she had been seen "driving, chasing somebody" with three kids in her car with "one kid [] hanging out the window." While she acknowledged the referral, Mother denied that the incident giving rise to the referral had ever happened. According to the Child Advocate's report, which was admitted into evidence, the referral was for negligent supervision of Elliott by Mother.

On January 22, 2019, the Department received another referral alleging Mother had left Elliott unsupervised in a car parked outside the hotel where she was employed. Mother testified the car was parked in the front where she could see it and that she had only gone inside to pick up her check and had come right back out. Although she acknowledged leaving Elliott in the car unsupervised, she denied that he was alone for two hours. She also denied working that day and claimed the officer at the scene spoke to her general manager and a co-worker who corroborated her story.

She also acknowledged the Department received another referral concerning Elliott in May 2017. The referral alleged that one of Mother's family members, who was babysitting for then one-year-old Elliott, spanked or hit him and locked him in

13

a closet. Although the Department filed for temporary custody of Elliott at that time, the judge denied the request.

On March 13, 2019, Mother was interviewed at the Alcohol, Tobacco and Firearms' ("ATF") offices regarding the federal charges currently pending against her. Mother admitted that she left her children at home alone when she went for the interview and when law enforcement searched her apartment, they found a firearm in a bathroom drawer accessible to the children. Mother, who did not know if the firearm was loaded, admitted that if the officer testified at the show cause hearing in this case that the firearm was loaded, she would have no reason to argue the point.

Mother also admitted that this event was similar to the 2010 referral alleging she has left Evan home alone with access to a firearm, but she pointed out that the firearm found in 2010 was in a top kitchen cabinet, whereas the firearm involved in the March 2019 incident was found in a bathroom drawer. Mother also admitted that one of the firearms was stolen, but she did know which one. Mother also acknowledged that the March 2019 incident was the third or fourth documented time she had left her children unattended, and she agreed that she had a pattern of leaving her young children unattended.

Despite her criminal history and history with the Department, Mother testified she believed she could provide a safe and loving home for Elliott because she had learned from her past adversities. Mother explained she had been struggling as a

single mother working two jobs, and that she only left the children at home alone because she could not find a babysitter. She explained that unlike in the past, the children were older, and she now has "stable support" to help overcome those adversities.

With respect to possible placements for Elliott, Mother testified she asked David to intervene in this case and to help her with Elliott after Elliott was removed from Davis' home. She testified David filed a motion to intervene a few months before trial. Mother testified she intended to continue her relationship with David if Elliott was placed with him. When asked if she intended to live with David as a couple after she was released from prison, Mother responded, "Depending on the guidelines. If the guidelines state that I cannot live there, then I will not live there." Mother testified she would comply with the court's rules regarding her visitation and access to Elliott. She admitted, however, that she has difficulty following the law and she has a "history of not following rules." When asked if David knew she had a habit of leaving children alone with access to firearms, Mother testified, "Well, I'm sure he's aware now. He's on this call." When asked if she had spoken to David about "continually leaving young children alone to wander in the parking lot and have access to loaded weapons," Mother responded, "Yeah, I think we would know how to practice safe habits for the children."

On cross-examination, Mother testified she understood that if the court placed Elliott with David, there would likely be "very, very strict restrictions about [her] access and visitation" to Elliott, and Mother testified that she would abide by those restrictions. Mother understood that if she violated those rules, it was possible the Department would remove both Elliott and Debra, his younger half-sister, from David's home.

With respect to Father's proposed placement, Mother testified she did not know Spicer, and, unlike David, Mother would not have any contact or interactions with Spicer. She further testified that she was not opposed to having a relationship with Spicer or reaching out to Elliott through Spicer.

With respect to her family service plan, Mother testified that she received her current service plan in March 2019 and she completed it by July 2019.[11] Mother denied that she refused to do services in August 2018. When asked why she did not complete the substance abuse assessment required by her plan, Mother testified that she was working with a different social worker at the time and the social worker told her she did not need to complete the substance abuse assessment because, aside from her initial test, all of Mother's drug tests were negative. Mother testified that she was under the impression she had completed all her requirements by the time she

---

[11] Mother received a family service plan after she allegedly removed Elliott from Father's possession at gunpoint in January 2018.

16

was arrested in July 2019. Mother testified that she emailed Clark while she was in federal detention and informed her that she had completed her plan and she had been sending Clark all her pay stubs prior to her arrest. Mother testified that she learned the Department believed she had not completed her requirements while she was in federal detention and she submitted to a drug test while there. Mother testified that given her incarceration, she had limited access to the services she needed to complete her service plan to the Department's satisfaction. When asked about her positive drug tests, Mother testified that she has never used drugs. She explained that the small amount of cocaine found in her hair at the beginning of the case could have been because she deals with cash at work and cocaine could have been transferred to her that way.

### 3. Jamesha Roy

Jamesha Roy ("Roy"), Elliott's Child Advocate, agreed that Mother's parental rights to Elliott should be terminated and she believed it was in Elliott's best interest to appoint the Department as Elliott's sole managing conservator. Roy explained that Mother had not demonstrated she was able to care for Elliott and, given her criminal history and history with the Department, Mother was not able to provide a safe and stable home for Elliott. When asked if she had an opinion as to placement, Roy testified she wanted more time to investigate the issue because she had concerns about the protective capacity of the current placement options, including David. Roy

testified that Elliott's current foster home was meeting all of Elliott's emotional, educational, and physical needs and his foster mother was willing to keep him long-term while the Department determined the best possible relative or fictive kin placement for Elliott.

After hearing closing arguments, the trial court informed the parties that it wanted more time to consider placement options and would render a judgment by email.

## B. Trial Testimony on November 11, 2020 and December 2, 2020

On November 11, 2020, Father, who was not present for trial, made a motion to reopen the evidence to allow him to testify on the merits. After the court granted his motion to reopen the evidence, Father testified that he was watching Elliott in January or February 2018 at Mother's request. When Mother did not come home as planned, he repeatedly contacted her, and she became belligerent and threatened him. At that point, Father gathered up Elliott's things and took him to Father's friend's home because he did not feel it was safe for Elliott to be with Mother.

Father testified that he also called the police to inform them that he was not kidnapping Elliott, and that Mother had been threatening him. Father also contacted the Department. According to Father, Mother arrived at his friend's home a few weeks later with her mother and her brother and they took Elliott away at gunpoint.

Father testified that all three were charged with a crime because of this incident.[12] Father explained that, if he could not have possession of Elliott, he wanted Elliott placed with Spicer, over David, because Father believed that anyone associated with Mother would allow her access to Elliott.

On December 2, 2020, the trial concluded after the parties made their closing arguments.

## C.    Final Decree and Post-Trial Events

The trial court signed a final decree on February 3, 2021 terminating Mother's and Father's parental rights to Elliott and appointing the Department as Elliott's sole managing conservator.  The trial court terminated Mother's rights based on the court's findings that (1) Mother committed the predicate bases for termination under Subsections D, E, N, and O of the Family Code, and (2) termination of Mother's rights was in Elliott's best interest.

Mother and Father appealed the final decree. While their appeals were pending, the trial court granted Father's motion for new trial and signed an order on April 13, 2021 vacating the portion of the February 2021 decree terminating Father's parental rights and resetting his case for trial.  The order states:

> After hearing the arguments presented and taking judicial notice of the Court's file, the Court finds that good cause exists to grant the motion.

---

[12]    The record reflects that Mother was charged with aggravated assault with a deadly weapon.

19

In accordance with this ruling, the Court vacates the portion of the February 3, 2021 final decree of termination that terminated [Father's] parental rights.

## D.     Father's New Trial[13]

On January 25, 2022 and March 10, 2022, the court held a new trial as to the Department's claims against Father.  On March 10, 2022, the trial court heard testimony regarding a mediated settlement agreement ("MSA") executed by Father, the Department, and Elliott's attorney ad litem.  In the MSA, the parties agreed that V.S. ("Valerie"), the mother of one of Father's older sons, would be appointed as Elliott's sole managing conservator, Father would be appointed as a possessory conservator, and David would be appointed as a non-parent possessory conservator for the limited purpose of enabling sibling visitation.

### 1.     Clark

Clark testified that Elliott had visited with Valerie and her family five times, including two overnight weekend visits.  She reported the visits had been going "really, really well" and after the first visit, Elliott asked when he was going back.  According to Clark, Elliott is bonded with Valerie and he talks about Valerie and her seventeen-year-old son, Elliott's half-brother, all the time.  Elliott's half-brother is excited about living with Elliott and getting to know him.  The Department had no

---

[13]     Although Mother did not appear at or participate in the 2022 trial, we include this background information because the proceeding is relevant to Mother's issues on appeal.

concerns with placing Elliott with Valerie and Clark believed it would be in Elliott's best interest for the trial court to render a final decree in conformance with the MSA. Clark testified that Elliott should continue with therapy for a brief period.

### 2. Valerie

Valerie, the mother of Father's seventeen-year-old son, testified that she was willing to take Elliott into her home and be appointed as his sole managing conservator. She explained that she had discussed the matter with her husband and family, and they were all in agreement.

Valerie testified that it had been "an absolutely joy" getting to know Elliott the last few weeks and she was "pleasantly surprised at just how adjusted" he was. She noted that Elliott is excited about coming to her home and he does not want to leave. With respect to Elliott's relationship with his half-brother, Valerie testified Elliott "absolutely adores his brother and the feeling's mutual." Valerie's son has "really taken" to Elliott and her husband adores him. According to Valerie, Elliott "fits right in and I'm just so, so happy that it has turned out the way that it has." Valerie also testified that it was necessary for Elliott to continue with therapy for the time being and she agreed to continue with his sessions.

### 3. Roy

Roy, Elliott's Child Advocate, testified next. Roy testified that Child Advocates was not a party to the MSA, and they had concerns about allowing Father

to visit Elliott. With respect to Valerie, Roy testified she observed Elliott in Valerie's home and had spoken with Elliott outside of those visits. According to Roy, Elliott really likes Valerie's home, and he is excited about moving there. She believed that Valerie and her family are nice, and they have "adjusted to him well." She further testified that Valerie and her family enjoy having Elliott in their home and they have the means to care for him. According to Roy, Child Advocates had no concerns about Valerie's relationship with Elliott or her ability to care for him. Roy did, however, have some concerns about Valerie's ability to oversee Father's visitations. Nevertheless, Roy further testified she believed Valerie will "have pretty good protective capacity when it comes to like meeting his needs and making sure that everything is taken care of, and if issues arise, she'll be able to meet those -- those needs."[14]

On May 10, 2022, the trial court issued a final decree that, as agreed in the MSA, appointed Valerie as Elliott's sole managing conservator, Father as a possessory conservator, and David as a non-parent possessory conservator for the limited purpose of enabling sibling visitation. The final decree states:

> On February 3, 2021, the Court entered a decree terminating the parental rights of [Mother] and [Father].
>
> . . . .

---

[14] Father also testified but only for the purposes of asking the court to render judgment in accordance with the MSA.

22

The retrial of the issues involving the parental rights of [Father] was heard on January 25, 2022, and March 10, 2022.

The Court makes no changes to the Court's February 3, 2021 decree except to vacate the portion of the judgment terminating the parental rights of [Father]. The Court's decision to terminate the parental rights of [Mother] in the February 3, 2021 decree remains unchanged.

On May 25, 2022, Mother filed a notice of appeal challenging the May 10, 2022 decree.

## Jurisdiction

In her first issue, Mother argues there is no final decree terminating her parental rights because the February 3, 2021 decree was vacated when the trial court granted Father's motion for new trial on April 13, 2021. She argues the May 10, 2022 decree does not state the grounds upon which Mother's rights were terminated and thus, the decree does not satisfy the requirements of Section 161.206 of the Family Code and Rule 306 of the Rules of Civil Procedure as to her. TEX. FAM. CODE § 161.206 (setting forth requirements for final decree of termination); TEX. R. CIV. P. 306 (requiring final decree of termination to, among other things, "state the specific grounds for termination"). Although she does not expressly state as much, Mother's first issue raises the question of our jurisdiction over her appeal.

This Court has jurisdiction only over appeals from final judgments and certain interlocutory orders that the Legislature has designated as immediately appealable. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). We

do not have jurisdiction over interlocutory appeals of parental termination decrees. *See In re E.S.T.*, No. 01-21-00088-CV, 2021 WL 3669629, at *1 (Tex. App.—Houston [1st Dist.] Aug. 18, 2021, no pet.) (mem. op.); *see also In re C.R.D.*, No. 03-19-00561-CV, 2019 WL 4281929, at *1 (Tex. App.—Austin Sept. 11, 2019, no pet.) (mem. op.) (dismissing termination appeal where order did not dispose of all parties and issues); *In re E.A.F.*, No. 14-13-00618-CV, 2013 WL 4945751, at *1 (Tex. App.—Houston [14th Dist.] Sept. 12, 2013, no pet.) (mem. op.) (same). Thus, if Mother is correct and there is no final decree in this case disposing of the Department's claims against her, we have no choice but to dismiss her appeal for want of jurisdiction.

Mother argues the trial court's April 13, 2021 order granting Father's motion for new trial vacated the entire February 3, 2021 termination decree, including the portion of the decree terminating her parental rights. The April 13, 2021 decree, however, expressly states:

> After hearing the arguments presented and taking judicial notice of the Court's file, the Court finds that good cause exists to grant the motion.
>
> In accordance with this ruling, the Court *vacates the portion of the February 3, 2021 final decree of termination that terminated [Father's] parental rights*.

(Emphasis added). Thus, contrary to Mother's assertion, the April 13, 2021 order did not vacate the portion of the February 3, 2021 decree terminating her parental rights to Elliott. Rather, the April 13, 2021 order rendered the initial February 3,

24

2021 decree interlocutory because the decree no longer disposed of all parties and issues in this termination proceeding.

After Father's new trial concluded in 2022, the trial court issued a second termination decree on May 10, 2022 disposing of the remaining claims against Father. When the trial court issued the May 10, 2022 decree, the interlocutory February 3, 2021 decree merged into it and became final. *See Bonsmara Natural Beef Co., L.L.C. v. Hart of Texas Cattle Feeders, L.L.C.*, 603 S.W.3d 385, 390 (Tex. 2020) ("When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment. . ."); *Webb v. Jorns*, 488 S.W.2d 407, 408–09 (Tex. 1972) (holding interlocutory order merges into final judgment and becomes final for purposes of appeal).

Mother does not dispute that the portions of the February 3, 2021 decree terminating her parental rights satisfies the requirements of Section 161.206 of the Family Code and Rule 306 of the Rules of Civil Procedure as to her. TEX. FAM. CODE § 161.206; TEX. R. CIV. P. 306. Instead, she contends that the February 3, 2021 decree did not merge into the May 10, 2022 decree, because the May 10, 2022 decree merely states that "any and all previous interlocutory orders are incorporated into this final judgment," and does not expressly state that the February 3, 2021 decree is incorporated by reference. But interlocutory orders need not be expressly incorporated by reference for purposes of merging into a final judgment. An

25

interlocutory judgment merges into the final judgment and become final for purposes of appeal, "whether or not the interlocutory judgment is specifically named within the final judgment." *See Radelow-Gittens Real Prop. Mgmt. v. Pamex Foods*, 735 S.W.2d 558, 560 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *see also Runnymede Corp. v. Metroplex Plaza, Inc.*, 543 S.W.2d 4, 5 (Tex. Civ. App.—Dallas 1976, writ ref'd) (holding interlocutory summary judgment merged into final order dismissing suit when court sustained plea in abatement, even though final order "did not refer to the previous interlocutory order and did not mention [remaining defendant]"). We thus conclude that the May 10, 2022 decree is the final decree and because the interlocutory February 3, 2021 decree was not vacated as to Mother, that interlocutory decree merged into the final May 10, 2022 decree and became final for purposes of appeal.

We overrule Mother's first issue.

### Termination of Mother's Parental Rights

In her second, third, fourth, and fifth issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings she engaged in the predicate acts set forth in Texas Family Code Sections 161.001(b)(1)(D), (E), (N), & (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), & (O). She also argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in Elliott's best interest.

26

## A.     Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted).  Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.*

In a termination case under Texas Family Code section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child.  *See* TEX. FAM. CODE § 161.001(b).  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as

to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to not be credible. *Id.* But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must

28

hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducing a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We assume "that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). We cannot "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re Commitment of Stoddard*, 619 S.W.3d at 674. Rather, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

## B.    Predicate Findings

In her second, third, fourth, and fifth issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings she engaged in the predicate acts set forth in Texas Family Code Sections 161.001(b)(1)(D), (E), (N), & (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), & (O).

## 1. Applicable Law – Section 161.001(b)(1)(E)

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 230 (Tex. 2019); *see* TEX. FAM. CODE § 161.001(b).

Under Section 161.001(b)(1)(E), a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). The term "endanger," as used in Section 161.001(b)(1)(E), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Section 161.001(b)(1)(E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.— Houston [1st Dist.] 2010, pet. denied). Thus, the relevant inquiry is whether there is evidence the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *Jordan*, 325 S.W.3d at 723 (citing *In re R.D.*, 955

S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied)). "[E]ndangering conduct is not limited to actions directed towards the child" and "may include the parent's actions before the child's birth, while the parent had custody of older children[.]" *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The danger to the child may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"). A parent's past endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied).

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id*. at 739. Evidence of a parent's criminal conduct, convictions, and imprisonment may support a finding of endangerment under Section 161.001(b)(1)(E) because such conduct subjects a child to a life of uncertainty and instability. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct that subjects child to life of uncertainty and instability endangers child's

physical and emotional well-being); *see also In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child.") (citing *Boyd*, 727 S.W.2d at 533). A parent's use of illegal drugs may also support termination under Section 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345.

## 2. Analysis

Mother argues there is legally and factually insufficient evidence to support the trial court's finding that she engaged in the predicate acts set forth in Texas Family Code Section 161.001(b)(1)(E) because (1) there is insufficient evidence that Mother left Elliott unattended, (2) Mother's criminal history predates Elliott's birth and "does not rise to level of violent conduct that should be required to constitute a course of conduct that endangers a child's physical or emotional well-being," (3) there is no evidence of ongoing drug use on Mother's part, and (4) even if the trial court believed Father's testimony over Mother regarding the January 2018 incident in which she allegedly removed Elliott from Father at gunpoint, that "constitutes only a single event and not a course of conduct as required for termination under subsection (E)."

Mother pleaded guilty to (1) carrying a weapon in 2006 when a handgun was found in her car for which she was sentenced to 10 days in jail, (2) theft in 2012 for which she was sentenced to 2 days in jail, and (3) failing to identify herself to a peace officer in 2015, for which she was sentenced to 15 days in jail.[15] These convictions, which occurred prior to Elliott's birth, constitute endangering conduct for purposes of establishing a course of conduct under Section 161.001(b)(1)(E). *See J.O.A.*, 283 S.W.3d at 345 (stating endangering conduct "may include the parent's actions before the child's birth"); *In re V.V.*, 349 S.W.3d at 554 (stating endangering conduct includes criminal activity because such activity exposes parent to incarceration) (citing *Boyd*, 727 S.W.2d at 533).

In June 2010, Mother pleaded guilty to the state jail felony offense of endangering a child after she left her oldest child, two-year-old Evan, at home alone with access to a firearm. *See In re J.O.A.*, 283 S.W.3d at 345 (recognizing endangering conduct "may include the parent's actions before the child's birth, while the parent had custody of older children"); *see also Walker*, 312 S.W.3d at 617 ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(b)(1)(E) has been established."). Mother was initially placed on deferred adjudication for that offense,

---

[15] The charge for failing to identify herself to a peace officer stemmed from an incident in September 2014.

but the deferred adjudication was revoked in 2010 and she was sentenced to six months in state jail.

In April 2015, the Department received a referral of neglectful supervision of eight-year-old Evan and three-year-old Erik by Mother. The referral alleged that Mother had left the boys alone at home while she was at work and the children were found wandering in the apartment complex's parking lot.[16] *See In re J.O.A.*, 283 S.W.3d at 345; *Walker*, 312 S.W.3d at 617. The boys' paternal grandmother received conservatorship as a result of the referral. Mother was also charged with the state jail felony offense of abandoning a child with the intent to return as a result of the incident.

On March 1, 2016, less than one month after Elliott was born, Mother pleaded guilty to the offense, received deferred adjudication, and was placed on community supervision for four years. *See In re V.V.*, 349 S.W.3d at 554 (stating endangering conduct includes criminal activity because such activity exposes parent to incarceration) (citing *Boyd*, 727 S.W.2d at 533). The terms of her community supervision prohibited her from, among other things, committing illegal acts, using any controlled substances, or possessing a firearm, and she was required to submit to drug tests.

---

[16] Although the offense occurred in April 2015, Mother pleaded guilty and was placed on community supervision in March 2016.

In January 2018, Mother and two of her relatives went to Father's friend's home and took Elliott from Father at gunpoint. The record reflects Mother was charged with aggravated assault with a deadly weapon stemming from this incident. The State moved to adjudicate guilt in May 2018 based in part on this incident and the motion was still pending as of the date of trial. According to Mother, she retrieved Elliott with Father's permission and Father, who was angry she brought her brother with her to the home, retaliated against her by making a bogus claim to the Department and the police. Mother testified that Father recanted, and the charges were dismissed because Father refused to cooperate with the State. Father, however, testified that Mother and her relatives took Elliott from him at gunpoint, and he denied that he refused to cooperate. Father testified that he repeatedly called the district attorney's office and inquired about the status of the case after Mother was charged. Based on Father's testimony, the trial court could have found that Mother not only violated the law by taking Elliott from Father by gunpoint, but she also violated the terms of her community supervision by possessing a firearm and committing the underlying illegal conduct, thus, subjecting herself to future incarceration. *See In re V.V.*, 349 S.W.3d at 554 (stating endangering conduct includes criminal activity because such activity exposes parent to incarceration) (citing *Boyd*, 727 S.W.2d at 533); *see also Robinson*, 89 S.W.3d at 686–87 (holding parent's violation of terms of community supervision constituted endangering

35

conduct for purposes of Section 161.001(b)(1)(E)).  Although Mother denied having a firearm or taking Elliott against Father's wishes, the trial court, as the sole arbiter of witness credibility, was entitled to disbelieve Mother's testimony and credit Father's testimony on this point.  *See In re J.O.A.*, 283 S.W.3d at 346 (recognizing that factfinder, not appellate court, is sole arbiter of witness's credibility and demeanor); *see generally In re T.G.R.-M.*, 404 S.W.3d at 15 (considering dismissed criminal charges when accessing sufficiency of evidence supporting termination under Section 161.001(b)(1)(E)).

After Father contacted the Department about the January 2018 incident, the Department opened an investigation.  In February 2018, Mother submitted to a drug test and her hair sample tested positive for cocaine.  The Child Advocates report, which was admitted into evidence without objection, reflects Mother also tested positive for cocaine and marijuana in May 2018.  Although Mother denied using drugs and testified that she probably tested positive for cocaine because she handled a lot of cash at work, the trial court was entitled to disbelieve her testimony.  *See In re J.O.A.*, 283 S.W.3d at 346 (noting trial court's role as arbiter of witness credibility).  Mother's use of illegal drugs, as evidenced by her positive drug tests, is another violation of the terms of her community supervision, thus, exposing her to the likelihood of incarceration.  *See Robinson*, 89 S.W.3d at 686–87 (identifying

36

parent's violation of terms of community supervision as endangering conduct for purposes of Section 161.001(b)(1)(E)).

In September 2018, the Department received another referral for negligent supervision of Elliott by Mother stemming from allegations that Mother was observed driving at a high rate of speed with three kids in the car and one of the children was hanging out of the car's window. Although Mother denied the incident occurred, the trial court, as the sole arbiter of a witness' credibility, was entitled to disbelieve her testimony. *See In re J.O.A.*, 283 S.W.3d at 346.

In January 2019, the Department received another referral for negligent supervision of Elliott by Mother, alleging Mother left two-year-old Elliott unsupervised for approximately two hours in a car parked at the hotel where Mother worked. At trial, Mother acknowledged that she left Elliott in the car, but she disputed that she was gone long and testified that she only left him long enough to go inside to get her check. The record reflects this was the third time Mother had left one of her young children unsupervised.

In March 2019, Mother was interviewed at ATF's offices and, by her own admission, she left her children at home alone with a handgun in a bathroom drawer. She denied, however, that the gun was accessible to the children and testified that she did not know if it was loaded. Even if there is no evidence that Elliott was left alone at this time as Mother contends, as opposed to his other siblings, this evidence

is nonetheless relevant for purposes of evaluating Mother's sufficiency challenge under Subsection E because "endangering conduct is not limited to actions directed towards" the child. *See id.* at 345; *see also Walker*, 312 S.W.3d at 617 ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(b)(1)(E) has been established.").

In July 2019, Mother was indicted in federal court for three counts of robbery and three counts of knowingly carrying, using, and brandishing a handgun, after she allegedly robbed three people on November 13, 2018, November 17, 2018, and January 6, 2019. The federal charges were pending as of trial and exposed her to the further likelihood of incarceration. *See In re V.V.*, 349 S.W.3d at 554 (stating endangering conduct includes criminal activity because such activity exposes parent to incarceration) (citing *Boyd*, 727 S.W.2d at 533).[17]

Thus, the record reflects that Mother has a pattern of unsafe parenting, including leaving her young children unsupervised on four occasions, with access to handguns on two of those occasions. As a result of these incidents, Mother was convicted of the state jail felony offenses of child endangerment and child abandonment with intent to return, and Evan and Erik's paternal grandmother was given conservatorship of the boys. These state jail felony convictions are only part

---

[17] The record reflects that Mother was later convicted and sentenced to fourteen years' incarceration.

of Mother's extensive criminal history, which spans over thirteen years. All of Mother's criminal conduct, arrests, charges, and convictions constitute endangering conduct because they exposed her to the likelihood of incarceration, and in some cases, resulted in incarceration. Taken together, this evidence establishes that Mother engaged in a course of conduct that endangered Elliott's physical or emotional well-being. *Jordan*, 325 S.W.3d at 723 (stating evidence must demonstrate voluntary, deliberate, and conscious course of conduct by parent).

Mother argues there is insufficient evidence she left Elliott unattended, as opposed to his siblings, because while she admitted that she had left her "children" unattended three or four times, "the record is unclear as to whether she ever left Elliott unattended." Although she disputed the length of time Elliott was alone, Mother admitted she left Elliott unsupervised in January 2019 in a car parked outside of the hotel where she was employed. Furthermore, regardless of whether Mother left Elliott unsupervised, as opposed to one of his siblings, such evidence is nonetheless relevant with respect to whether she engaged in an endangering course of conduct for purposes of Section 161.001(b)(1)(E). *See In re J.O.A.*, 283 S.W.3d at 345 ("[E]ndangering conduct is not limited to actions directed towards the child" and "may include the parent's actions before the child's birth, while the parent had custody of older children").

With respect to her criminal history, Mother argues that she "does not have the kind of criminal history that warrants a finding that she engaged in conduct that endangered the child's physical health or emotional development" because her four convictions occurred before Elliott's birth and three of her convictions are for "low-level offenses" that resulted in minimal jail time. Endangering conduct, however, includes conduct that occurred before the child was born. *See id.* (stating "endangering conduct may include the parent's actions before the child's birth"). While she admits she was also convicted in 2010 of the state jail felony offense of child endangerment and was sentenced to six months in state jail, and she pleaded guilty in 2015 to the state jail felony offense of abandoning a child with the intent to return, for which she received deferred adjudication with a period of community supervision for four years, Mother contends "[t]hese are not violent crimes, nor was any child injured in any of them." Mother's argument is not persuasive. Endangering conduct need not be violent or result in harm or injury to a child, it must only expose the child to loss, injury, or jeopardy. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"). Furthermore, even non-violent, misdemeanor offenses, and arrests for criminal conduct that do not result in conviction will support a finding of endangerment. *See In re V.V.*, 349 S.W.3d at 554 (stating endangering

40

conduct includes criminal activity because such activity exposes parent to incarceration) (citing *Boyd*, 727 S.W.2d at 533); *see also In re T.G.R.-M.*, 404 S.W.3d at 15 ("Although the charges stemming from these two arrests were ultimately dismissed, each time the mother was jailed, she was absent from T.G.R.-M.'s life and was not able to provide for T.G.R.-M.'s physical and emotional needs.").

Mother also argues there is no evidence of ongoing drug use on her part. The record reflects Mother tested positive for cocaine in February 2018 and positive for cocaine and marijuana in May 2018 while the Department had a case pending against her stemming from the January 2018 event when she allegedly removed Elliott from Father's care at gunpoint. A parent's use of illegal drugs constitutes endangering conduct under Subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345. In this case, Mother's positive drug tests occurred during a prior investigation by the Department and while she was also on community supervision for the 2015 offense of child abandonment. Mother's drug use violated the terms of her community supervision and thus constitutes endangering conduct for purposes of Section 161.001(b)(1)(E). *See Robinson*, 89 S.W.3d at 686–87 (stating parent's violation of terms of community supervision is endangering conduct under Section 161.001(b)(1)(E)). Although not "ongoing," Mother's past

41

drug use is nevertheless part of a course of conduct that endangered Elliott's well-being because it exposed Mother to future jail time. *See Walker*, 312 S.W.3d at 617.

Finally, Mother acknowledges there is some evidence that, if believed, establishes she removed Elliott from Father's possession at gunpoint in January 2018. She argues, however, that evidence of a single incident of endangering conduct is insufficient to support a finding under Section 161.001(b)(1)(E). While we agree with Mother that there must be evidence of an ongoing course of conduct, as opposed to a single event, to support a finding under Subsection E, we disagree that the January 2018 event is the only evidence of endangering conduct in this case. *See Jordan*, 325 S.W.3d at 723 (stating evidence must demonstrate voluntary, deliberate, and conscious course of conduct by parent). As previously discussed, the record reflects that among other things, Mother has a pattern of leaving her young children, including Elliott, unsupervised and, on at least two occasions, with access to firearms.

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed Elliott with persons who engaged in conduct that endangered his physical or emotional well-being in violation of Section 161.001(b)(1)(E). *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire

record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother engaged in conduct or knowingly placed Elliott with persons who engaged in conduct that endangered his physical or emotional well-being in violation of Section 161.001(b)(1)(E). *In re J.F.C.*, 96 S.W.3d at 266; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under Section 161.001(b)(1)(E), we need not address Mother's arguments that the evidence is legally and factually insufficient to support the trial court's finding under Sections 161.001(b)(1)(D), (N), and (O). *See In re A.V.*, 113 S.W.3d at 362 (stating only one predicate finding is necessary).

We overrule Mother's second, third, fourth, and fifth issues.

## C.     Best Interest of Child

In her sixth issue, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in Elliott's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### 1.     Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a

43

child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  But there is also a presumption that the permanent placement of a child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including:  (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who

44

have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

This list of factors is not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest). A parent's past conduct is

probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

### 2. Analysis

Multiple factors support the trial court's finding that termination of Mother's parental rights was in Elliott's best interest, the first of which is Mother's lengthy history with the Department regarding Elliott and her two oldest children. In 2010, Mother left Elliott's half-brother, who was two years old at the time, at home alone with access to a firearm. In 2015, Mother left Elliott's two older half-brothers at home alone when they were eight years old and three years old, and the children were found wandering in the apartment complex's parking lot. Despite being convicted of state jail felony offenses for these incidents and losing custody of two of her children because of the 2015 occurrence, in January 2019 Mother nevertheless left two-year-old Elliott unsupervised in a car in the parking lot of a hotel for almost two hours and in March 2019, Mother left her children at home alone with access to a firearm when she was being interviewed at the ATF's offices. The 2019 events and the September 2018 incident when Mother was observed speeding with three

46

children in her car, and one child hanging out the window, occurred while this case was pending. Notably, the Department opened the case in January 2018 after Mother removed Elliott from Father's possession by gunpoint. These facts, which also support a finding of endangerment under Subsection E of the Family Code, establish a pattern of conduct demonstrating Mother's inability or unwillingness to provide safety and stability for her young children. *See Holley*, 544 S.W.2d at 372 (recognizing stability of home, ability to provide for child's current and future physical and emotional needs, parental ability of persons seeking custody, and acts or omissions by parent indicating parent-child relationship is not appropriate as best-interest factors); *see also In re C.H.*, 89 S.W.3d at 28 (stating evidence supporting predicate finding may be probative of best-interest determination); *In re S.G.S*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (stating factfinder could infer from actual neglect of one child that physical and emotional well-being of other children was also jeopardized).

Elliott was six years old when the trial court rendered its final decree terminating Mother's parental rights. In light of Mother's pattern of leaving Elliott and her other young children unsupervised, Elliott's young age also weighs in favor of termination of Mother's rights. *See In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969, at *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating young ages of the children—five and six years old—rendered them

47

vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Mother's continued criminal conduct also supports the trial court's finding that termination of her parental rights was in Elliott's best interest. *See In re V.V.*, 349 S.W.3d at 554 (stating intentional criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being). The record reflects Mother pleaded guilty to the state jail felony offense of endangering a child in 2010 and abandoning a child with intent to return in 2015. She was eventually sentenced to six months in state jail for the 2010 offense and, although she had been placed on deferred adjudication with respect to the 2015 offense, the State filed a motion to adjudicate guilt with respect to that charge in May 2018. The motion to adjudicate was pending at the time of trial. Mother also pleaded guilty to (1) carrying a weapon in 2006 when a handgun was found in her car, (2) theft in 2012, and (3) failing to identify herself to a peace officer in 2015. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (noting evidence of parent's inability to maintain lifestyle free from arrests and incarcerations is relevant to best-interest determination); *see also In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (stating child is subjected "to ongoing uncertainty regarding who

will take care of him" when "parent repeatedly commits criminal acts that subject the parent to incarceration").

Most recently, Mother was in a federal detention center at the time of trial because she had been indicted for robbery after she allegedly robbed hotel employees while knowingly carrying, using, and brandishing a handgun. Mother was also charged with the felony offense of aggravated assault with a deadly weapon after she allegedly removed Elliott from Father's care at gunpoint in January 2018, but the charge was later dismissed. Although the federal charges were pending as of trial and the aggravated assault charge did not result in a conviction, these charges are nevertheless relevant for purposes of determining whether the termination of Mother's parental rights is in Elliott's best interest. *See In re T.G.R.-M.*, 404 S.W.3d at 15 (concluding that although criminal charges were ultimately dismissed, each time mother was jailed she was absent from child's life and unable to provide for child's physical and emotional needs).

With respect to the plans for placement by the parties seeking custody, the record reflects that Elliott was in therapy and living in a foster home when Mother's trial took place. Clark and Roy confirmed that although it was a non-adoptive placement, Elliott's foster home was meeting all of Elliott's emotional and physical needs and his foster parent would keep him long-term until the Department found a permanent placement for the child. By the time Father's new trial commenced, the

Department believed it was in Elliott's best interest to place Elliott with Valerie, the mother of one of Elliott's half-siblings. Clark, Roy, and Valerie testified that Elliott was well bonded with Valerie and her family and he was excited about living with them. When Elliott visited with Valerie's family, he did not want to leave. The Department did not have any concerns about Valerie's ability to meet Elliott's current and future emotional and physical needs and provide a safe, and stable home for Elliott.

Even excluding the evidence of Elliott's placement with Valerie, this factor would still support the court's best-interest finding because the trial court could have reasonably determined that the Department's plan to keep Elliott in foster care while it searched for the best placement was superior to Mother's plan to place Elliott with David immediately. Even though Elliott was "well bonded" with Mother and his younger sister who lived with David, David's home study had been approved and, at that time, the Department favored placing Elliott with David, the Department and Child Advocates were still concerned about David's ability to protect Elliott from Mother in the event she was released from prison. Although Mother testified that she would follow the court's rules with respect to access to Elliott if Elliott were placed with David, Mother admitted she had a habit of not following the rules, and as the arbiter of witness credibility, the trial court was at liberty to disbelieve her

testimony. *See In re J.O.A.*, 283 S.W.3d at 346 (recognizing that factfinder, not appellate court, is sole arbiter of witness's credibility and demeanor).

Although Mother testified that she completed her family plan and denied she ever refused to work all of her services, Clark testified that Mother had not completed her plan before she was arrested in July 2019, and the record reflects Mother refused to comply with the Department's plan in 2018. The trial court could have credited Clark's testimony and the record over Mother's testimony and concluded that Mother had not fully availed herself of the services offered to her while the case was pending. *See Holley*, 544 S.W.2d at 372 (recognizing services available to persons seeking custody as best-interest factor); *see* TEX. FAM. CODE § 263.307(b) (recognizing willingness and ability of child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate appropriate agency's close supervision as best-interest factor).

With respect to excuses for parent's acts or omissions, Mother argues that she left her children at home alone because she was a single mother who did not have anyone available to care for the children while she was at work. She explained that unlike in the past, her children were older, and she now has "stable support" to help overcome those adversities. Elliott, however, was only four years old at the time of Mother's trial in 2020 and unable to be left unsupervised. To the extent Mother is referring to David as her current stable support system, the record reflects David and

Mother were together while this case was pending, including in March 2019 when by her own admission, she left the children at home alone with access to a handgun. *See Holley*, 544 S.W.2d at 371–72 (recognizing excuses for parent's acts or omissions as factor for purposes of best-interest analysis).

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Elliott's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Elliott's best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's sixth issue.

### Conservatorship

In her seventh issue, Mother argues the trial court abused its discretion by (1) naming Valerie as Elliott's sole managing conservator in the May 10, 2022 decree, and (2) not naming Mother as a possessory conservator because the evidence supporting the finding required by Texas Family Code Section 153.131 is legally and factually insufficient. *See* TEX. FAM. CODE § 153.131(a) (requiring trial court to appoint "parent" as managing conservator "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the

appointment would significantly impair the child's physical health or emotional development").

Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856. An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b); *see also In re J.D.G.*, 570 S.W.3d at 856. Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of the Department or another person as the child's sole managing conservator may be considered a "consequence of the termination." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also In re J.D.G.*, 570 S.W.3d at 856.

Because we have overruled Mother's challenges to the portion of the trial court's decree terminating her parental rights, the decree divested Mother of her legal rights and duties related to Elliott. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Mother lacks standing to challenge the portion of the decree appointing Valerie as Elliott's sole managing conservator. *See In re J.D.G.*, 570 S.W.3d at 856 (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, could not challenge conservatorship determination).

Mother also argues the trial court erred by not appointing her as one of Elliott's possessory conservators. When a parent is not appointed as a sole or joint managing conservator, Texas Family Code Section 153.191 requires trial courts to appoint the parent as a possessory conservator "unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." TEX. FAM. CODE § 153.191. Section 153.191, however, only applies to parents, and Mother's parental rights to Elliott were terminated. *See* TEX. FAM. CODE § 101.024(a) (stating "parent," as used in Family Code, "does not include a parent as to whom the parent-child relationship has been terminated"); *see also Z.A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.) (overruling mother's argument trial court erred by not appointing her as child's possessory conservator because court failed to make requisite findings pursuant to Family Code Section 153.191 and noting "this section only applies to 'a parent' and Mother's parental rights to Bobby were terminated by the trial court").

We overrule Mother's seventh issue.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy<br>Justice

Panel consists of Justices Kelly, Rivas-Molloy, and Guerra.